Our next case is Xylex Pharmaceuticals Inc. v. Aveva Drug Delivery Systems, Inc. 25-1002. Counselor Davies, you have reserved four minutes of time for rebuttal. Is that correct? That's correct, Your Honor. Okay, we're ready for you. Good morning, Your Honors, and may it please the Court. During my time today, I'd like to focus on the claim construction issue that is before this Court because all of the District Court's additional rulings with respect to vitiation, estoppel, and infringement are based on the District Court's flawed claim construction of the term dissolving agent. The term dissolving agent means a two-component combination that maintains lidocaine in a dissolved state in the plaster of the patch. In a trial, the party's experts agreed that the dissolving agent must maintain lidocaine in a dissolved state in the patch. So the dispute between the parties is then whether you can read in an additional manufacturing step into the product claims at issue, and we believe that you should not. Aveva is essentially saying that the dissolving agent has two functions, and we say it has one function. The District Court explained this extra manufacturing step in its opinion at paragraph 65. It stated the asserted claims cover a patch where lidocaine is dissolved in a combination of isosteric acid and dipropylene glycol before mixing that lidocaine solution in a plaster. That is a clear manufacturing limitation that was read into what is otherwise a product claim directed to a patch. Aveva also explains this manufacturing step in its brief at page 1. The dissolving agent functions as a co-solvent for dissolving lidocaine drug substance before mixing with adhesives. Again, this is a clear manufacturing step that is being read in, and the District Court improperly read in this manufacturing step into, again, what are purely product claims when we look at the claims. Another point, Your Honors. Aveva's construction and the District Court's construction is actually taken directly from extrinsic evidence, and that is a statement that was made to the Patent Office during the prosecution of what is the 640 patent. And that's wrong because the 640 patent bears no family relationship to any of the asserted patents. The 640 patent has a very different specification than the asserted patents, and the 640 patent at the time that statement was made had very different claims that were pending before the Patent Office at that time. So Aveva is essentially taking the statement from extrinsic evidence out of context and applying it to the construction of an unrelated patent and a claim term in this case. So appellant's construction inappropriately limits the function of the dissolving agent to the finished patch and does not include this extra manufacturing step that Aveva and the District Court are attempting to read in. If we turn first to the claims, the claims are unequivocally directed to products, and those are specifically finished patches and the dissolving agents that are in those patches. If we look at Claim 4, which is the only claim that is asserted in this case that is clearly directed to a nonaqueous patch that contains a dissolving agent consisting of isosteric acid and dipropylene glycol. So a product claim with a dissolving agent in the patch. Claim 1, from which Claim 4 depends, is also directed to a patch and a dissolving agent which are contained in that plaster. Again, and there's no dispute that the plaster is a component of the finished patch. So again, clearly a product claim without any mention of manufacturing limitations at all. It's an apparatus claim. I would refer to it as a product claim, Your Honor, but it could be an apparatus claim, yes. But it is definitely not a manufacturing claim in any way. It contains no manufacturing or process limitations. It is directed to a finished patch. The claims are clearly directed to products. They're, in your words, Your Honor, an apparatus and they make no mention of any manufacturing steps. And in these claims, the function of the dissolving agent, therefore, must occur in the patch itself, in the finished patch. And that function is to maintain lidocaine in a dissolved, non-crystalline state in the patch. And how do we know that? If we turn to the specification, the specification talks about a problem and then the way in which the claims and the invention of this patent solve that problem. Specifically, the problem identified in the specification was the development of crystalline lidocaine in patches. And the problem with that is when you develop crystalline lidocaine in the patches, if the lidocaine is not completely dissolved in those patches, the drug can't get out of the patch. So you've got a patch with lidocaine in it, but the lidocaine is crystalline and it can't move from the patch into the skin. So you're not getting any of the benefits of putting the patch on. And then the specification does not talk about any problem with dissolving that lidocaine before it's in the patch. The relevant problem is, what is the status of the lidocaine in the patch? If it's crystalline, that's a problem. And that's the problem that they set out to solve. The way they solve the problem, for example, at column 2, lines 17 to 19 of the 174 patent, it refers to a nonaqueous patch in which the lidocaine is completely dissolved and which is effective to relieve various muscle pains over a long period of time. Again, the solution is a patch that has lidocaine completely dissolved in a noncrystalline state. The solution is not some manufacturing step. And the way this is achieved is the use of a dissolving agent that is able to maintain lidocaine in that dissolved state over a long period of time. So it's able to prevent that recrystallization in the patch over a long period of time. And that's discussed, for example, at specification at column 2, lines 42 to 46. So again, what is required for release of the drug, release of the lidocaine from this patch, is that it remains dissolved in a noncrystalline state in the patch and not any particular manufacturing steps that were used to achieve that patch. And, in fact, the specification expressly says, and this is at columns 3, lines 40 to 42, that the claim patches are not limited to any particular manufacturing method and they can be produced by any conventional method. If we look at the examples, each of the examples in the patents has three parts. The first part are the formulation components. And I'm looking at, for example, example 1 of the patent, which for your reference is at column 4, lines 6 through 46. So turning back to the examples, they have three parts. The first part are the formulation components of the patch. The second part of the examples describes a production method that could be used to make the patches. And then the third thing that's discussed is the finished patch itself. And here the claims are directed to one part of the examples. They're directed to the finished patch. They're not directed to the manufacturing method that is also part of the examples. The specification goes on to say that when these patches in examples 1 and 6 were tested, they showed generally good results with respect to the amount of lidocaine that's released from the patch into the skin. And we know the reason that is from the other parts of the specification is that the dissolving agent is maintaining the lidocaine in a non-crystalline state in the patch. Excuse me. So for all these reasons, this court, we believe, should construe the term dissolving agent as a two-component combination that maintains lidocaine in a dissolved state in the plaster of the patch. And as a result, vacate the district court's claim construction, adopt appellant's claim construction, and vacate and remand all the other issues in this case which applied this faulty claim construction, including vitiation, estoppel, and infringement. You have no further questions? I'm sorry, Your Honor. Could you reference the prosecution history argument? Absolutely, Your Honor. So with respect to the prosecution history, the court, in its opinion, and this is at paragraph 182 and also at 111, it claims that there is a clear and unmistakable disclaimer that would allow it to read in this manufacturing step, and we disagree. We believe that the court read those statements out of their context. Most importantly, that the claims at issue during the prosecution were always directed to product claims, never included manufacturing steps, and they should be read in that manner. For example, when patentee made statements responding to the rejection over the HANBA reference that's discussed in the prosecution of the 174, it was talking about the invention. There they're talking about the invention, which is the patch, not any invention, which is a product, not any invention that is a manufacturing step. And we believe that Aveva and the district court ignored the context that those claims were made in, and Aveva actually went so far as to both in its trial presentation and in its briefing actually remove the context from the arguments that were made in HANBA, and that clearly is not the proper analysis that should be done. Without getting into the minutia of each of the statements that were made, the parties dispute what those statements meant in the context of the prosecution history, but they are at most ambiguous, and it's our position that none of them rise to a clear and unmistakable disclaimer that would allow you to read in what is clearly a manufacturing step that finds no support in either the claims or the specification. Thank you, Your Honor. Thank you. Counselor Jarros? Jarros, yes. Good morning, Your Honors. May it please the court. I believe counsel just referred to the minutia of the prosecution history, but that's what this trial was about. During the prosecution of the asserted patents, they specifically described, defined dissolving agent, and then distinguished the prior art and obtained their patent because they were able to identify this dissolving function. I do want to step back and also address what the infringement theories were at trial. Silex had two theories at trial. The first was that my client's product, which contains allele alcohol, allele alcohol is equivalent to the claimed dipropylene glycol. There was no dispute as to literal infringement my client designed around. So Silex's theory at trial was the allele alcohol was equivalent to dipropylene glycol because it's an alcohol. The trial court rejected that theory, and it rejected it with detailed fact findings that allele alcohol is a different molecular structure, different physicochemical properties. It's hydrophobic, it's a surfactant, and it's actually a mixture of monoalcohols, not the polyalcohols that were claimed. Counsel had an extended argument on claim construction, did not identify a single error in any of those fact findings, which support vitiation. Vitiation was an independent basis for the court's decision, and this court can affirm solely on that basis. This separate question of dissolving agent does not involve the question of vitiation. The question of vitiation is would finding allele alcohol equivalent to dipropylene glycol vitiate the polyalcohol and dipropylene glycol limitations? So would I be correct to say that the district court's construction required that the lidocaine be dissolved in the dissolving agent? That is correct, Your Honor. That is a separate question from vitiation because the limitation there is only dipropylene glycol. We never reached this separate question of whether or not the district court correctly construed the dissolving agent until we get to Silex's second theory. So in our view, this court may affirm on vitiation alone. That ends the case. If the court were to reach Silex's separate theory, what the trial court called the co-solubilizer or the solubilizer theory, on that basis, the court also rejected their equivalence theory. Under that theory, Silex argued that the dipropylene glycol and isosteric acid in the claimed patch was equivalent to the isosteric acid and the allele alcohol in Aviva's patch. The district court specifically addressed that theory and rejected it. And it did so because at the essence of what was called the minutia, the prosecution history of this case, they claimed a patch. They claimed a patch with lidocaine, isosteric acid, and dipropylene glycol. The prior art had all of those elements and the examiner rejected multiple times the claimed patch, finding that Hanma, Takada, and Terahara all included those elements. So this patentee, Oishi, was compelled to not only describe its function of the dissolving agent to dissolve in an organic acid and a polyalcohol, but they then had to distinguish that prior art to obtain the patent. And they made very clear statements that what they are claiming is a dissolving agent that dissolves lidocaine in only the organic acid and the polyalcohol. And they directed the examiner to the example on their patent where that dissolution occurs. Based on detailed findings of the prosecution history, the district court ultimately concluded the dissolving function is necessary. That is what distinguished this claimed invention from the prior art. With that, Your Honor, unless there are questions, I'd be happy to address the claim construction points raised by counsel. With respect to claim construction, I do want to start with the word dissolving. Counsel used that word dissolving in the conventional way. That's to break apart a solid. But their theory of claim construction takes the dissolving out of dissolving agent. So if we start with the claims themselves, the word dissolving is right there in the term dissolving agent. There's nothing to import. There's nothing to go find. The claims themselves describe the function of dissolving using the word dissolving. If we then turn to the written description to further evaluate that claim term, looking at the 174 patent in column 2, we see the word dissolve, column 2, line 43, and then the word continuous and reliable dissolution of lidocaine, lines 45 and 46. There the patent is using dissolution in the sense that counsel used it, that second function, to maintain dissolution in the patch. But then when we turn to the examples, example 3 in column 5, we see the word dissolution again in the context of the making of the patch and specifically the dissolving of the lidocaine. So column 5, example 3, line 43, refers to a dissolution mixer and dissolving certain ingredients and then specifically, as they pointed the examiner to, a solution separately prepared by mixing the isosteric acid, lidocaine, and dipropylene glycol, followed by dissolution at 80 degrees Celsius. So we have in the written description both dissolution functions, one describing maintaining dissolution, the other the breaking apart of that solid lidocaine. And then finally, your honors, I'll just direct this court to the district court's extensive detailed findings about the prosecution history. None of those have been disputed. Instead, the briefing argued about what various prior art references mean but there's not a single error that has been identified with respect to any fact finding by the district court with respect to any of the patents. And unless there are questions on that, I would like to simply turn to the clear and unmistakable disclaimer. So following the examiner's rejection, finding that Hanma and Takada had disclosed lidocaine, isosteric acid, and dipropylene glycol, as we set forth in the briefing at appendix 6242, four separate times as the district court found, Oishi repeatedly and clearly distinguished their invention, quote, in the present invention, lidocaine is dissolved in an organic acid and a polyalcohol. They said that four times to distinguish Hanma because Hanma claimed dissolving a lidocaine salt in an alcohol solvent. So they had a big problem to overcome that the examiner presented to them and they were required to identify the dissolving function of their dissolving agent to distinguish those references. And then finally, your honors, I'd like to address the Terahara distinction. Here we have at appendix 6262, the examiner rejecting the claim patch based on Terahara. And again, this prior art had all of the components in Oishi's claim patch, isosteric acid, dipropylene glycol, and lidocaine. It was directly on point and to distinguish that, Oishi was required to narrow its claims to consisting of, so limit its dissolving agent to a two-component dissolving agent. And then also, and I'll find the appendix site here, as I mentioned earlier, Oishi directed the examiner at appendix 6295 to example 3 where Oishi explained the support for the narrowing to consisting of can be found in example 3. And then they directed the examiner to the dissolving function using the dissolving agent to dissolve the lidocaine. And then to, as the district court correctly found, clearly and unmistakably at appendix 6297, Oishi stated, quote, claim 1 has been amended to provide that the dissolving agent consists only of an organic acid and a polyalcohol. This is not taught in Terahara. In fact, Terahara uses toluene in all of its examples to solubilize the plaster. So time after time, Oishi was compelled to distinguish the prior art based on its dissolving function. And that's exactly what the district court concluded. And there have been no errors presented to this court with respect to any of those findings. Did Silex propose an alternative construction to the court? They did. They did not? Silex did propose an alternative construction at trial, and it's the construction very similar to what was presented here today. And on that point, Your Honor, I will close with what I started with. The question of vitiation is only a question of that dipropylene glycol limitation. We never reached the question of how do we construe a dissolving agent, how clear and unmistakable is that disclaimer, because vitiation alone is supported by fact findings by the trial court that have not been challenged. Thank you. Thank you. Mr. Davies, you had a little over five minutes left to rebuttal, if you need that much. Thank you, Your Honor. Your Honor, I'd like to start with counsel's reference to the use of the term dissolution in the specification. Counsel acknowledged that at column two, lines 40 to 43, which is the passage I referenced, that indeed does refer to the function of the dissolving agent in the patch to maintain lidocaine dissolved in the patch. He then pointed to another meaning of the term dissolution, but he pointed to a portion of the spec that is part of the examples, that is part of the manufacturing step in those examples. And again, that is part of the example that we did not claim. So the use of it in the manufacturing step is not relevant to the product claims, to the apparatus claims that we have before us. With respect to vitiation, this court cannot affirm- Manufacturing claims not produce the product that's claimed? I'm sorry, Judge Hughes, I missed the first part of the question. Do the manufacturing claims not produce the product that's claimed? There are no manufacturing claims in the patent or that are asserted in this case. The patent in the specification describes- There are manufacturing things in the specification. There are, Your Honor. There are various methods that are described in the specification. Are those used to produce the claim products? They are examples of ways to make the accused products, Your Honor, yes. Are there other examples that don't use those methods? All the examples in the patent use what is called a hot melt method. Again, that's one type of manufacturing method that could be used. And again, the patent says expressly that the patches can be made by any conventional method. And I can pull that slide up again, but I address that. Do any of those conventional methods not use a dissolving agent to dissolve the lidocaine into the patch? Certainly, Your Honor. You could use something else to dissolve the lidocaine. Where does it say that in the patent? Where does it say that you could use something other than the dissolving agent to dissolve them? It says it could be used by any conventional method. For example, you could have a situation- Every method you have uses the dissolving agent. I'm sorry, Your Honor. Every specific method you describe in the specification uses a dissolving agent. In the examples in the specification, that is correct. They use the dissolving agent to dissolve in that method. But again, that's an example method, and we do not believe that that is sufficient to read that express manufacturing limitation into a claim which doesn't otherwise contain any limitations like that. Turning back to vitiation again, the court cannot affirm on vitiation alone. I mean, if we disagree with you on the claim construction, we don't have to reach any of these other arguments about vitiation, do we? Your Honor, we agree that this case rises or falls on the claim construction issue, and that's why we believe that if you adopt our claim construction, that it falls in terms of all the other issues. And if we agree with the district court in claim construction, it's an affirm? We agree with that, Your Honor, yes. I appreciate it. That's a candor. Yes. With respect to vitiation, you cannot affirm on vitiation alone. If you look at the court's opinion with respect to vitiation, and that's paragraph 176 of the order, and at 176 of the order, the court states, in light of the facts found by the court in this case, finding a monoalcohol to be equivalent to the specifically claimed polyalcohol would vitiate the polyalcohol limitation and render it meaningless. And then if you looked at the facts that appear, the findings that appear before that, paragraphs 164 and 165, the court states, So what the court is doing here is it is relying on an insubstantial differences test, the function way result test, and in order to conduct that, it must have applied its claim construction. And that's why you cannot affirm on vitiation alone, because the polyalcohol limitation and the dipropylene glycol limitation that are the subjects of the equivalent analysis are part of the dissolving agent, and their function can only be understood in the proper construction of that dissolving agent. If the court has no further questions? No, we thank you for your arguments. We thank all the parties for your arguments this morning, and we'll take this case under submission.